THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., Barry Taul, <br><br> Plaintiff, <br><br> vs. <br><br> NAGEL ENTERPRISES INC., individually and d/b/a ABANKS MORTUARY & CREMATORY, and JED NAGEL, <br><br><br><br> Defendants. | CIVIL ACTION NO. _____ <br><br><br> FILED IN CAMERA AND UNDER SEAL <br><br> (TRIAL BY JURY DEMANDED) |

## QUI TAM COMPLAINT

COME NOW Barry Taul, Relator, by and through undersigned counsel, before this Honorable Court on behalf of himself and the United States of America, its departments and agencies, and bring this action against Defendants Nagel Enterprises, Inc., individually and d/b/a Abanks Mortuary & Crematory, and Jed Nagel for money damages and civil penalties arising out of Defendant's violations of the False Claims Act, 31 U.S.C. § 3729, which violations are described hereinafter with particularity.

## JURISDICTION AND VENUE

1. Jurisdiction is conferred pursuant to the False Claims Act, 31 U.S.C.A. §§ 3730(b)(1) and 3732 in as much as this action seeks remedies on behalf of the United States for violations of 31 U.S.C.A. § 3729 by Defendant.

2. Venue is proper pursuant to 31 U.S.C.A §3732(a) in that Defendant Nagel Enterprises, Inc., individually and d/b/a Abanks Mortuary & Crematory is a domestic corporation that transacts business within this judicial district and Defendant Jed Nagel is an individual resident of the State of Alabama who transacts business within this judicial district.

## TOLLING OF STATUTE OF LIMITATIONS

3. The Wartime Suspension of Limitations Act (WSLA), 18 U.S.C. § 3287 provides for the tolling of the federal False Claims Act's statute of limitations until "5 years after the termination of hostilities as proclaimed by presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

4. Since the October 11, 2002 Congressional authorization of the President to use military forces in Iraq, the United States has been at war as defined by the WSLA. *United States ex rel. Carter v. Halliburton Co.*, 2013 U.S. App. LEXIS 5309 at *16-17 (4th Cir. Mar. 18, 2013); *see also, U.S. v. BNP Paribas SA*, 2012 U.S. Dist. LEXIS 110293 (S.D. Tex. Aug. 6, 2012).

5. Therefore, the relevant statute of limitations for this Complaint has been tolled since October 11, 2002.

## PARTIES

6. Relator Barry Taul acting on behalf of the United States, brings this civil action under the Qui Tam provisions of the False Claims Act, as amended in 1986.

7. Relator Barry Taul is a citizen of the United States and a resident of the State of Alabama.

8. Defendant Jed Nagel (hereinafter "Nagel"), upon information and belief,

2

is a citizen of the United States and is a resident of the State of Alabama.

9. Defendant Nagel Enterprises, Inc., individually and d/b/a Abanks Mortuary & Crematory (hereinafter "Nagel-Abanks"), is a corporation organized pursuant to the laws of the State of Alabama with its principal place of business in Birmingham, Alabama.

## FACTS

10. Relator Barry Taul started working for Nagel-Abanks from June 2006 until September 2009.

11. The owner and principal of Nagel-Abanks is Defendant Jed Nagel.

12. The Alabama Organ Center is the only federally designated Organ Procurement Organization for the State of Alabama.

13. The Alabama Organ Center coordinates the equitable use of organs and tissues for life-saving transplants and medical research.

14. In and around June 2003, Nagel-Abanks and the Alabama Organ Center, by and through their respective agents Jed Nagel, Demosthenes "Dem" Lalisan (Director of the Alabama Organ Center), and Richard Alan Hicks (Associate Director of the Alabama Organ Center), entered into an agreement to harvest tissue at Nagel's facility. This agreement involved the harvesting of tissue, bone, muscle, and tendons but not organs.

15. Under the agreement between Nagel and the Alabama Organ Center, when a bone or tissue donor died, the organ center called Abanks with the death information. Abanks, by and/or at the direction of Nagel, would remove the donor from the place of death and bring them to Abanks for harvesting. After the tissue had been harvested the

3

donor would then be transported by Abanks to the funeral home of the deceased's choosing. One particular division of the Alabama Organ Center that was involved in the agreement was the called the gift of body program (hereinafter "GOB").

16. After the harvesting, the GOB donor's remains were cremated and returned to the donor family. Because Nagel-Abanks also operated a crematory, this Defendant was paid pursuant to the agreement to do the cremation.

17. In or around June 2003, Lalisan and Hicks convinced the Alabama Organ Center to enter into the aforementioned agreement with Nagel-Abanks by arguing that it would be more cost efficient for the Center to perform all tissue recoveries in Birmingham. Lalisan and Hicks reasoned that they could have a tissue recovery team on the ready 24 hours a day in Birmingham. Further, the Alabama Organ Center could pay Nagel-Abanks to remove the donors from anywhere in the state of Alabama and bring them to its Birmingham facility; pay for the use of Nagel-Abanks' embalming room, pay for tissue harvesting performed by Nagel-Abanks, and pay Nagel-Abanks for cremations performed on the GOB donors.

18. In reality Lalisan and Hicks promoted the services of Nagel-Abanks in exchange for kickback payments from Nagel-Abanks. Consequently, from approximately June 2003 until approximately June 2011 Defendants Nagel-Abanks and Jed Nagel made illegal kickback payments to Lalisan and Hicks in exchange for the contractual referral business from the Alabama Organ Center.

19. For each month from June 2003 until approximately June 2011, in Birmingham, Alabama, Lalisan and Hicks would meet at Nagel-Abanks with Nagel to discuss the Alabama Organ Center's bill for the previous month's services. At these

4

monthly meetings Lalisan, Hicks and Nagel would cook the books by fabricating charges to the Alabama Organ Center.

20. For example, for each month from June 2003 until approximately June 2011, in Birmingham, Alabama, Lalisan, Hicks and Nagel would add miles onto transportation services. Further, if a GOB donor was disqualified for tissue harvesting, the books might indicate that the GOB donor did have tissue harvested so the embalming room charge could be used as well as the cremation charge.

21. It is standard in the death care industry to have a removal fee for picking up a body from the place of death. Usually this is a flat rate that includes a certain geographical area. If the removal requires going outside that area there is a per mile charge that takes place.

22. The Nagel-Abanks transportation, embalming, cremation and harvesting charges to the Alabama Organ Center were well over national averages and often were inflated. At the monthly meetings of Nagel, Lalisan, and Hicks, they determined how much the bills would be for the previous month. Consequently, the bills were submitted to UAB (the University of Alabama Birmingham) for payment. Once the bills were paid, twenty percent of the bill would be given back to Hicks and Lalisan by Nagel; Hicks and Lalisan received ten percent each of the kickback.

23. Under the kickback scheme, Lalisan and Hicks guaranteed that Nagel-Abanks would be able to bill $50,000.00 to $60,000.00 each month to the Alabama Organ Center. This bill was paid for with government grants, Medicare, and other federal and taxpayer dollars as these donor services were free to the donor families.

24. In approximately the first week of June 2009, in Birmingham, Alabama,

Relator Barry Taul became of aware of the aforementioned fraud and illegal kickbacks.

25. In approximately the first week of June 2009 Taul, an employee of Nagel-Abanks and Nagel at that time, was sent from Nagel-Abanks' Birmingham Alabama location to deliver cremains to a funeral home in Columbiana, AL.

26. While Taul was on this delivery run the only person at Nagel-Abanks was Jed Nagel.

27. When he arrived back at Nagel-Abanks' mortuary he entered the back of the building. When Taul entered the building he was not heard because the crematory, a very loud machine, was in full operation.

28. As Taul walked to the front of the building, he heard voices coming from the front office. Taul did not recognize the voices at first so he paused before going into the office area because he wanted to know if this was a family in the office making cremation arrangements. If this was this case, Taul didn't want to be disrespectful of a grieving family and barge in on their arrangement conference.

29. In approximately the first week of June 2009, as he approached however, Taul recognized the voices in the front office as those of Lalisan, Hicks, and Nagel. Because Taul was on a first name basis with all three individuals, he approached the office to announce his return. At this point, Taul overheard Nagel telling Lalisan and Hicks that if they wanted to continue to get ten percent they were going to have to pad "this bill a little more." Taul knew these comments were improper but didn't fully understand the full scope of the conversation at that moment.

30. When Taul entered the office Nagel, Lalisan and Hicks were shocked to see him. The three men stopped talking immediately and then changed the subject. All

three seemed very nervous. Lalisan and Hicks left very shortly after. Nagel then called Taul into the office and told him that he didn't hear anything. Nagel told Taul that it takes a little grease on some palms sometimes to make money. At this point, Nagel informed Taul of the kickback scheme and fraudulent billing referenced above in ¶¶15-29.

31.  In approximately the first week of June 2009, Nagel told Taul that if he (Taul) ever told anybody about the fraud and the kickback scheme Taul had overheard, he (Nagel) would cremate Taul alive and no one would ever find Taul's remains.

32.  Nagel is a huge man and Taul took Nagel's threat very seriously. Nagel also said that he knew where Taul lived, where Taul's parents lived and that he (Nagel) would also torture or kill them as well. After these threats, Nagel became very verbally abusive towards Taul during Taul's everyday work environment.

33.  Nagel also became physically abusive. For example, between June 2009 and October 2009, in Birmingham, Alabama, Nagel would kick doors into Taul. Also, Nagel often would slap Taul open handed. Once, between June 2009 and October 2009, Nagel even threw an open embalming fluid bottle at Taul resulting in embalming fluid, a very dangerous chemical, spilling all over Taul.

34.  During the same time frame, between June 2009 and October 2009, Nagel once threw feces from deceased individuals at Taul. Also, during this same time frame Nagel once took a full catheter bag from a deceased and emptied it on Taul's back. This abusive behavior was designed to scare and intimidate Taul so that he would be too fearful of the consequences of disclosing the fraudulent scheme involving Nagel-Abanks, Nagel, Lalisan and Hicks.

35.  The foregoing behavior resulted in Taul fearing retribution to himself and

his family from Nagel if Taul were to disclose what he knew about the aforementioned fraud/kickback scheme.

36. After Relator Taul became aware of this fraud and kickback scheme in approximately June 2009 and began suffering abusive behavior from Nagel, Taul began to actively look for employment at another funeral home. Subsequently, in approximately October 2009, Taul found employment at Valhalla funeral home in Midfield, Alabama.

37. In approximately, August 2010, Barry Taul informed the FBI of the fraud and illegal kickback scheme described above involving Lalisan, Hicks, nor Nagel/Abanks.

38. Relator Taul disclosed the fraud and illegal kickback scheme described above to the government before any public disclosure was made and therefore Relator Taul is the original source regarding said information.

39. Relator Taul has knowledge independent of the public disclosure relating to this matter that "materially adds" to the disclosure and said knowledge and/or information was provided to the government before Relator Taul filed his lawsuit.

40. Shortly after informing the FBI of the fraud and illegal kickbacks described above, in or around August 2010, Taul received a plain card hand addressed to him at Valhalla funeral home in Midfield, Alabama. On one side the card stated, "He knows it was you." Taul gave this card to the FBI and the FBI retained the card.

41. After this incident, in approximately October 2010, Taul's regional manager at Valhalla funeral home talked to him about an anonymous letter that had been received stating that Taul was a thief. Shortly after this incident, in or around February

2011, Taul was fired from Valhalla funeral home. No good reason was given by Valhalla funeral home for terminating Taul.

42. After he was terminated from Valhalla funeral home, it became virtually impossible for Taul to get a job in the funeral business in Birmingham, Alabama despite having worked in the funeral business in that area since 1985.

43. However, Taul finally found a job at a funeral home in Jasper, AL in approximately September 2012.

44. The Jasper funeral home used Nagel to perform their cremations. In late Fall 2012, one of Nagel-Abanks' employees came to the Jasper, Al funeral home to pick up a body to cremate. The employee of Nagel-Abanks saw Taul and asked if he was working at the funeral home. Shortly thereafter, on or about December 26, 2012, Taul was fired from the funeral home in Jasper, Al.

45. Since the time that Taul informed the FBI of the fraud and illegal kickbacks in August 2010, Taul has received several threats from Nagel against himself and his family.

46. Relator Taul has clearly been retaliated against by Nagel-Abanks and Nagel and continues to suffer the economic and emotional effects of this retaliation.

47. As a result of their actions Nagel-Abanks, Jed Nagel, Demosthenes "Dem" Lalisan and Richard Alan Hicks have violated the False Claims Act and defrauded the Government.

## COUNT I

**Violation of the False Claims Act, 31 U.S.C. §§3729(a) (1) (A)**

48. Plaintiff realleges all prior paragraphs of the Complaint as if set forth fully

herein.

49. Defendants Nagel-Abanks, Jed Nagel, Demosthenes "Dem" Lalisan and Richard Alan Hicks have knowingly presented or caused to be presented, a false or fraudulent claim for payment or approval.

50. By reason of the violation of 31 U.S.C. §§ 3729 (a) (1) (A) and 3729 (a)(1)(B), Defendants have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United Sates Government, prays:

(a) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(b) That the Relator be awarded all costs incurred, including reasonable attorney's fees;

(c) That in the event that the United States Government proceeds with this action, the Relator be awarded an amount for bringing this action of at least 15%, but not more than 30%, of the proceeds of the action or settlement of the claims;

(d) That in the event that the United States Government does not

        proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement;

(e)      That the Relator be awarded prejudgment interest;

(f)      That a trial by jury be held on all issues;

(g)      That the United States Government and the Relator receive all, both at law and at equity, to which they may reasonably be entitled.

## COUNT II

### Violation of the False Claims Act, 31 U.S.C. 3729(a) (1) (C)

51.      Plaintiff realleges all prior paragraphs of the Complaint as if set forth fully herein.

52.      Defendants Nagel-Abanks, Jed Nagel, Demosthenes "Dem" Lalisan and Richard Alan Hicks have conspired to commit a violation of 31 U.S.C. §§ 3729 (a) (1) (A) and 3729 (a)(1)(B).

53.      By reason of the violation of 31 U.S.C. § 3729 (a) (1) (C), Defendants have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United Sates Government, prays:

(h)      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States

Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(i) That the Relator be awarded all costs incurred, including reasonable attorney's fees;

(j) That in the event that the United States Government proceeds with this action, the Relator be awarded an amount for bringing this action of at least 15%, but not more than 30%, of the proceeds of the action or settlement of the claims;

(k) That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement;

(l) That the Relator be awarded prejudgment interest;

(m) That a trial by jury be held on all issues;

(n) That the United States Government and the Relator receive all, both at law and at equity, to which they may reasonably be entitled.

## COUNT III
### (False Record/False Statement)

**Violation of the False Claims Act, 31 U.S.C.A. § 3729(a) (1) (B)**

54. Plaintiff realleges all prior paragraphs of the Complaint as if set forth fully herein.

55. Defendants Nagel-Abanks, Jed Nagel, Demosthenes "Dem" Lalisan and Richard Alan Hicks have knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim.

56. By reason of the violation of 31 U.S.C. § 3729 (a) (1) (B), Defendant has knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United Sates Government, prays:

(o) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(p) That the Relator be awarded all costs incurred, including reasonable attorney's fees;

(q) That in the event that the United States Government proceeds with this action, the Relator be awarded an amount for bringing this

action of at least 15%, but not more than 30%, of the proceeds of the action or settlement of the claims;

(r) That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement;

(s) That the Relator be awarded prejudgment interest;

(t) That a trial by jury be held on all issues;

(u) That the United States Government and the Relator receive all, both at law and at equity, to which they may reasonably be entitled.

## COUNT IV
### Violation of the False Claims Act, 31 U.S.C.A. § 3730 (h)

57. Plaintiff realleges all prior paragraphs of the Complaint as if set forth fully herein.

58. Relator Taul was discharged, harassed and/or discriminated against in his termination by Defendant Nagel-Abanks Defendant Jed Nagel, by and through Defendants' respective officers, agents, employees and/or contractors because of lawful acts done by Relator Taul in the furtherance of an action under the False Claims Act including, but not limited to, Relator Taul's efforts to stop violations of the False Claims Act.

59. By reason of the violation of 31 U.S.C. § 3730 (h), Defendants have knowingly or recklessly damaged the Plaintiff in an amount to be determined at trial.

WHEREFORE, the Relator prays for the following relief:

(a) That the Relator be awarded all compensatory and punitive damages, including personal injury damages for mental anguish, pain and suffering and/or loss of reputation, to which he is entitled pursuant to 31 U.S.C. §3730(h) and other applicable law;

(b) That Relator be awarded two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination against Plaintiff;

(c) That the Relator be awarded all litigation costs and reasonable attorney's fees incurred as provided pursuant to 31 U.S.C. §3730(h) and other applicable law;

(d) That Relator receives all relief, both at law and at equity, to which he may reasonably be entitled.

Respectfully submitted,

_____
JERE L. BEASLEY (BEA020)

_____
W. DANIEL "DEE" MILES, III (MIL060)

_____
LARRY A. GOLSTON (GOL029)
Attorneys for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
272 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343
(334) 954-7555 FAX

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

*/s/*

Of Counsel

**FILED IN CAMERA AND UNDER SEAL**
**DO NOT SERVE DEFENDANT**