FILED
2017 Feb-01  AM 10:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BARRY TAUL, ex rel., UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 2:14-CV-0061-VEH** |
| **v.** | ) | |
| | ) | |
| **NAGEL ENTERPRISES, INC., et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

The primary issue for the court to decide is which claims arising under the False Claims Act ("FCA") in Counts I-V of the First *Qui Tam* Amended Complaint (the "Amended Complaint")(doc. 47)[1] brought by Plaintiff Relator Barry Taul ("Taul") are actionable against Defendants Nagel Enterprises, Inc. and Jed Nagel ("Defendants"). As explained below, some of Taul's claims are barred by their respective statutes of limitations, while others are not. Additionally, Taul's reverse FCA claims are due to be dismissed as inadequately alleged. This court retains jurisdiction to decide Taul's timely claims, and Defendants' Motion

---

[1]  All references to (Doc. __) correspond with the court's CM/ECF numbering system.

To Dismiss (doc. 85) is due to be **GRANTED IN PART** and **DENIED IN PART**.

## II.     PROCEDURAL BACKGROUND

Taul commenced this action against Defendants on January 13, 2014.[2,3] On

May 19, 2015, Taul filed an Amended Complaint, asserting five grounds for relief:

violations of (1) 31 U.S.C. § 3729(a)(1)(A); (2) 31 U.S.C. § 3729(a)(1)(C); (3) 31

U.S.C. § 3729(a)(1)(B); (4) retaliation under 31 U.S.C. § 3730(h); and (5) FCA

violations based on violations of 42 U.S.C. § 1320a-7b(b)(2). (Doc. 47). On July

13, 2015, Defendants filed their Answer, which raised the statute of limitations as

an affirmative defense. (Doc. 58). On July 30, 2015, Defendants moved for

summary judgment (Doc. 61), and on January 25, 2016, this court granted in part

and denied in part Defendants' Motion for Summary Judgment. (Doc. 80).

Currently pending before the court are the following Motions:

1.     Defendants' Motion To Dismiss, filed on October 7, 2016 (doc.
       85);

---

[2]  A complaint is first filed under seal to allow the government time to investigate and
potentially intervene. 31 U.S.C. § 3730(b)(2). If the government declines to intervene, the relator
may proceed with the action, *id.* § 3730(c)(3), and if successful, may recover between 25 and 30
percent of the judgment or settlement, plus reasonable expenses, attorney fees, and costs, *id.* §
3730(d)(2). An FCA violator is also subject to statutory penalties of between $5,000 and $10,000
per claim and treble damages. 31 U.S.C. §3729(a). The United States declined to intervene in this
*qui tam* action. (Doc. 6).

[3]  On August 31, 2011, a criminal case arising from the same facts and circumstances as
this whistleblower action was filed. In the criminal case, Demosthenes Lalisan and Richard Alan
Hicks were charged with a conspiracy to defraud the United States and two counts of healthcare
fraud. They pleaded guilty in the spring of 2012. *See* Memorandum Opinion, (Doc. 80 at 2).

2.      Defendants' Motion To Quash Plaintiff's Second Deposition
        Notice and Accompanying Request To Produce Documents at
        Deposition, filed on October 21, 2016 (doc. 86);

3.      Defendants' Motion To Strike/Defendants' Objections to
        Plaintiff's Second Set of Interrogatories and Requests for
        Production, filed on October 21, 2016 (doc. 87);

4.      Defendants' Motion To Amend/Correct his (doc. 86) Motion
        To Quash, filed on October 21, 2016 (doc. 88);

5.      Defendants' Motion for Leave To File a Response to Plaintiff's
        Surreply, filed on November 23, 2016 (docs. 96 and 97).[4]

On November 4, 2016, Taul filed a Response to Defendants' Motion

To Dismiss for Lack of Jurisdiction. (Doc. 90). On November 9, 2016,

Defendants filed their Reply. (Doc. 92). On November 21, 2016, Taul filed

his Surreply. (Doc. 95). All of the above Motions are now ripe for the

court's disposition.

## III.   MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion attacks the legal sufficiency of a complaint. FED. R.

CIV. P. 12(b)(6) ("[A] party may assert the following defenses by motion: (6)

failure to state a claim upon which relief can be granted[.]"). The complaint must

---

[4] CM/ECF documents 96 and 97 are identical, though they were filed in two different
ways. Doc. 96 is styled as a "Motion for Leave To File Response to Plaintiff's Surreply," and
Doc. 97 is styled as "Motion for Permission to File Response to Plaintiff's Surreply to
Defendants 2nd Motion To Dismiss."

provide a short and plain statement of the claim that will "give the defendant fair

notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*

*v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (quoting FED.

R. CIV. P. 8(a)(2)), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also* FED. R. CIV. P. 8(a)

(requiring that general pleading in a complaint include "a short and plain

statement of the claim showing that the pleader is entitled to relief").

A plaintiff must set forth grounds for entitlement to relief to survive a

motion to dismiss. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (citing *Conley*,

355 U.S. at 47, 78 S. Ct. at 103). Once a claim has been set forth adequately, it

may be "supported by showing any set of facts consistent with the allegations in

the complaint." *Twombly,* 550 U.S. at 563, 127 S. Ct.  at 1969. If well-pleaded

factual allegations support the complaint, a court "should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief."

*Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868

(2009). A claim is considered plausible when the plaintiff "pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* at 678. The complaint must establish "more than a

sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*,

550 U.S. at 556, 127 S. Ct. at 1965).

## IV.   STANDARD OF REVIEW FOR A STATUTE OF LIMITATIONS DEFENSE

Defendants' Motion To Dismiss (doc. 85) does not specify under which Federal Rule of Civil Procedure they seek to dismiss Taul's claims as untimely. In this Circuit, "[a] Rule 12(b)(6) motion to dismiss for failure to state a claim is an appropriate method for raising a statute of limitations defense. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977);[5] *see also Edwards v. Apple Computer, Inc.*, 645 F. App'x 849, 851 (11th Cir. 2016) (internal citations omitted)("A complaint is subject to dismissal when its allegations, on their face, show that an affirmative defense bars recovery on the claim . . . [t]hus, a motion to dismiss for failure to state a claim is an appropriate method for raising a statute of limitations defense.").[6] Accordingly, the court construes Defendants' Motion To Dismiss as a challenge under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[7] The court construes the Amended Complaint in the light most

_____

[5]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to 1981.

[6]   In the Eleventh Circuit, unpublished decisions are not binding precedent, but they may be cited as persuasive authority. 11th Cir. R. 36-2.

[7]   Taul's Response (doc. 90) construes Defendants' Motion as a 12(b)(1) facial challenge, but he cites no authority for his proposition that 12(b)(1) is the proper Rule under which this statute of limitations-based Motion should be brought. Plaintiff also admits that the standard of

5

favorable to Taul and takes the factual allegations contained therein as true.

## V.    FACTUAL ALLEGATIONS

Taul alleges the following facts in his Amended Complaint (doc. 47):

10. Relator Barry Taul started working for Nagel-Abanks from June 2006 until September 2009.

11. The owner and principal of Nagel-Abanks is Defendant Jed Nagel.

12. The Alabama Organ Center is the only federally designated Organ Procurement Organization for the State of Alabama.

13. The Alabama Organ Center coordinates the equitable use of organs and tissues for life-saving transplants and medical research.

14. In and around June 2003, Nagel-Abanks and the Alabama Organ Center, by and through their respective agents Jed Nagel, Demosthenes "Dem" Lalisan (Director of the Alabama Organ Center), and Richard Alan Hicks (Associate Director of the Alabama Organ Center), entered into an agreement to harvest tissue at Nagel's facility. This agreement involved the harvesting of tissue, bone, muscle, and tendons but not organs.

15. Under the agreement between Nagel and the Alabama Organ Center, when a bone or tissue donor died, the organ center called Abanks with the death information. Abanks, by and/or at the direction of Nagel, would remove the donor from the place of death and bring them to Abanks for harvesting. After the tissue had been harvested the donor would then be transported by Abanks to the funeral home of the deceased's choosing. One particular division of the Alabama Organ Center that was involved in the agreement was the[n] called the gift of body program (hereinafter "GOB").

---

review under a 12(b)(1) facial argument is the same as a standard of review under Rule 12(b)(6). *Id.* at 6. Therefore, the court will apply the 12(b)(6) standard, as encouraged by this Circuit.

16. After the harvesting, the GOB donor's remains were cremated and returned to the donor family. Because Nagel-Abanks also operated a crematory, this Defendant was paid pursuant to the agreement to do the cremation.

17. In or around June 2003, Lalisan and Hicks convinced the Alabama Organ Center to enter into the aforementioned agreement with Nagel-Abanks by arguing that it would be more cost efficient for the Center to perform all tissue recoveries in Birmingham. Lalisan and Hicks reasoned that they could have a tissue recovery team on the ready 24 hours a day in Birmingham. Further, the Alabama Organ Center could pay Nagel-Abanks to remove the donors from anywhere in the state of Alabama and bring them to its Birmingham facility; pay for the use of Nagel-Abanks' embalming room, pay for tissue harvesting performed by Nagel-Abanks, and pay Nagel-Abanks for cremations performed on the GOB donors.

18. In reality Lalisan and Hicks promoted the services of Nagel-Abanks in exchange for kickback payments from Nagel-Abanks. Consequently, from approximately June 2003 until approximately June 2011 Defendants Nagel-Abanks and Jed Nagel made illegal kickback payments to Lalisan and Hicks in exchange for the contractual referral business from the Alabama Organ Center.

19. For each month from June 2003 until approximately June 2011, in Birmingham, Alabama, Lalisan and Hicks would meet at Nagel-Abanks with Nagel to discuss the Alabama Organ Center's bill for the previous month's services. At these monthly meetings Lalisan, Hicks and Nagel would cook the books by fabricating charges to the Alabama Organ Center.

20. For example, for each month from June 2003 until approximately June 2011, in Birmingham, Alabama, Lalisan, Hicks and Nagel would add miles onto transportation services. Further, if a GOB donor was disqualified for tissue harvesting, the books might indicate that the GOB donor did have tissue harvested so the embalming room charge could be used as well as the cremation charge.

7

21. It is standard in the death care industry to have a removal fee for picking up a body from the place of death. Usually this is a flat rate that includes a certain geographical area. If the removal requires going outside that area there is a per mile charge that takes place.

22. The Nagel-Abanks transportation, embalming, cremation and harvesting charges to the Alabama Organ Center were well over national averages and often were inflated. At the monthly meetings of Nagel, Lalisan, and Hicks, they determined how much the bills would be for the previous month. Consequently, the bills were submitted to UAB (the University of Alabama Birmingham) for payment. Once the bills were paid, twenty percent of the bill would be given back to Hicks and Lalisan by Nagel; Hicks and Lalisan received ten percent each of the kickback.

23. Under the kickback scheme, which violated both the False Claims Act and the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), Lalisan and Hicks guaranteed that Nagel-Abanks would be able to bill $50,000.00 to $60,000.00 each month to the Alabama Organ Center. This bill was paid for with government grants, Medicare, and other federal and taxpayer dollars as these donor services were free to the donor families.

24. In approximately the first week of June 2009, in Birmingham, Alabama, Relator Barry Taul became of aware of the aforementioned fraud and illegal kickbacks.

25. In approximately the first week of June 2009 Taul, an employee of Nagel-Abanks and Nagel at that time, was sent from Nagel-Abanks' Birmingham Alabama location to deliver cremains to a funeral home in Columbiana, AL.

26. While Taul was on this delivery run the only person at Nagel-Abanks was Jed Nagel.

27. When he arrived back at Nagel-Abanks' mortuary he entered the back of the building. When Taul entered the building he was not heard

because the crematory, a very loud machine, was in full operation.

28. As Taul walked to the front of the building, he heard voices coming from the front office. Taul did not recognize the voices at first so he paused before going into the office area because he wanted to know if this was a family in the office making cremation arrangements. If this was this case, Taul didn't want to be disrespectful of a grieving family and barge in on their arrangement conference.

29. In approximately the first week of June 2009, as he approached however, Taul recognized the voices in the front office as those of Lalisan, Hicks, and Nagel. Because Taul was on a first name basis with all three individuals, he approached the office to announce his return. At this point, Taul overheard Nagel telling Lalisan and Hicks that if they wanted to continue to get ten percent they were going to have to pad "this bill a little more." Taul knew these comments were improper but didn't fully understand the full scope of the conversation at that moment.

30. When Taul entered the office Nagel, Lalisan and Hicks were shocked to see him. The three men stopped talking immediately and then changed the subject. All three seemed very nervous. Lalisan and Hicks left very shortly after. Nagel then called Taul into the office and told him that he didn't hear anything. Nagel told Taul that it takes a little grease on some palms sometimes to make money. At this point, Nagel informed Taul of the kickback scheme and fraudulent billing referenced above in ¶¶15-29.

31. In approximately the first week of June 2009, Nagel told Taul that if he (Taul) ever told anybody about the fraud and the kickback scheme Taul had overheard, he (Nagel) would cremate Taul alive and no one would ever find Taul's remains.

32. Nagel is a huge man and Taul took Nagel's threat very seriously. Nagel also said that he knew where Taul lived, where Taul's parents lived and that he (Nagel) would also torture or kill them as well. After these threats, Nagel became very verbally abusive towards Taul during

Taul's everyday work environment.

33. Nagel also became physically abusive. For example, between June 2009 and October 2009, in Birmingham, Alabama, Nagel would kick doors into Taul. Also, Nagel often would slap Taul open handed. Once, between June 2009 and October 2009, Nagel even threw an open embalming fluid bottle at Taul resulting in embalming fluid, a very dangerous chemical, spilling all over Taul.

34. During the same time frame, between June 2009 and October 2009, Nagel once threw feces from deceased individuals at Taul. Also, during this same time frame Nagel once took a full catheter bag from a deceased and emptied it on Taul's back. This abusive behavior was designed to scare and intimidate Taul so that he would be too fearful of the consequences of disclosing the fraudulent scheme involving Nagel-Abanks, Nagel, Lalisan and Hicks.

35. The foregoing behavior resulted in Taul fearing retribution to himself and  his family from Nagel if Taul were to disclose what he knew about the aforementioned fraud/kickback scheme.

36. After Relator Taul became aware of this fraud and kickback scheme in approximately June 2009 and began suffering abusive behavior from Nagel, Taul began to actively look for employment at another funeral home. Subsequently, in approximately October 2009, Taul found employment at Valhalla funeral home in Midfield, Alabama.

37. In approximately, August 2010, Barry Taul informed the FBI of the fraud and illegal kickback scheme described above involving Lalisan, Hicks, [and] Nagel/Abanks.

38. Relator Taul disclosed the fraud and illegal kickback scheme described above to the government before any public disclosure was made and therefore Relator Taul is the original source regarding said information.

39. Relator Taul has knowledge independent of the public disclosure

relating to this matter that "materially adds" to the disclosure and said knowledge and/or information was provided to the government before Relator Taul filed his lawsuit.

40. Shortly after informing the FBI of the fraud and illegal kickbacks described above, in or around August 2010, Taul received a plain card hand addressed to him at Valhalla funeral home in Midfield, Alabama. On one side the card stated, "He knows it was you." Taul gave this card to the FBI and the FBI retained the card.

41. After this incident, in approximately October 2010, Taul's regional manager at Valhalla funeral home talked to him about an anonymous letter that had been received stating that Taul was a thief. Shortly after this incident, in or around February 2011, Taul was fired from Valhalla funeral home. No good reason was given by Valhalla funeral home for terminating Taul.

42. After he was terminated from Valhalla funeral home, it became virtually impossible for Taul to get a job in the funeral business in Birmingham, Alabama despite having worked in the funeral business in that area since 1985.

43. However, Taul finally found a job at a funeral home in Jasper, AL in approximately September 2012.

44. The Jasper funeral home used Nagel to perform their cremations. In late Fall 2012, one of Nagel-Abanks' employees came to the Jasper, Al funeral home to pick up a body to cremate. The employee of Nagel-Abanks saw Taul and asked if he was working at the funeral home. Shortly thereafter, on or about December 26, 2012, Taul was fired from the funeral home in Jasper, Al.

45. Since the time that Taul informed the FBI of the fraud and illegal kickbacks in August 2010, Taul has received several threats from Nagel against himself and his family.

46. Relator Taul has clearly been retaliated against by Nagel-Abanks

11

and Nagel and continues to suffer the economic and emotional effects of this retaliation.

47. As a result of their actions Nagel-Abanks, Jed Nagel, Demosthenes "Dem" Lalisan and Richard Alan Hicks have violated the False Claims Act and defrauded the Government.

(Doc. 47 at 3-9).

## VI.   ANALYSIS

In his Amended Complaint, Taul alleges that the relevant statute of limitations for his FCA claims has been tolled since October 11, 2002, pursuant to the Wartime Suspension of Limitations Act ("WSLA") because the United States has been at war, as defined by the WSLA, since 2002. (Doc. 47 at 2). As of the time the Amended Complaint was filed on May 19, 2015, Taul's position was still good law. However, seven days later, on May 26, 2015, the Supreme Court held in *Kellogg Brown & Root Services, Inc., v. United States ex rel. Carter*, 135 S.Ct. 1970, 191 L. Ed. 2d 899 (2015), that the tolling provisions of the WSLA apply only to criminal cases. Because the WSLA does not apply in this civil case, the applicable statute of limitations for FCA claims is found under 31 U.S.C. § 3731(b), and the applicable statute of limitations for retaliatory claims is found under 31 U.S.C. § 3730(h)(3).

### A.    *The Applicable Statutes of Limitations*

The FCA's statute of limitations states as follows:

> (b) A civil action under section 3730 may not be brought -
>
> > (1) more than 6 years after the date on which the violation of Section 3729 is committed, or
> >
> > (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b)(1-2). The statute of limitations for retaliatory claims states as follows:

> (h) Relief from retaliatory actions.–
>
> . . . .
>
> > (3)   Limitation on bringing civil action.– A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.

31 U.S.C. § 3730(h)(3).

### B.   *Statute of Limitations for Taul's Retaliation Claims (Count IV)*

The court previously held that some, but not all, of Taul's retaliation claims in Count IV were barred. *See* Memorandum Opinion, (doc. 80 at 25) ("[Taul] is correct [in stating that not all alleged retaliatory actions were more than three

years old at the time of the filing of his initial Complaint on January 13, 2014],

since one of [the] alleged instances of harassment occurred in the fall of 2012 . . .

[t]he retaliation alleged in paragraph 44 of the complaint survives, but summary

judgment is granted as to any other claims of retaliation.").

Despite the court's earlier ruling, Defendants erroneously continue to claim

that the statute of limitations on all of Taul's retaliation claims has run because

Taul has not alleged any retaliatory events occurring in the fall of 2012 or

thereafter. (Doc. 92 at 1, 9). This is simply incorrect, *see* (Doc. 47 at 9, ¶¶ 43-46),

and Defendants' argument is not well taken by this court.

Therefore, as previously ordered, Taul's retaliation claims from fall 2012

survive, but Plaintiff's other retaliation claims are barred by the 3-year statute of

limitations pursuant to Section 3730(h)(3).

### C.    *Statute of Limitations for FCA Claims (Counts I, II, and III)*

Count I of the Amended Complaint asserts a claim under Section

3729(a)(1)(A) of the False Claims Act, which holds any person liable who

"knowingly presents, or causes to be presented, a fraudulent claim for payment or

approval." 31 U.S.C. § 3729(a)(1)(A). Count II asserts a claim under Section

3729(a)(1)(C), which creates liability for those who "conspire[] to commit a

violation of subparagraph (A), (B), (D), (E), (F), or (G)" of Section 3729. 31

14

U.S.C. § 3729(a)(1)(C). Count III asserts a claim under Section 3729(a)(1)(B), which holds any person liable who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

Defendants posit their argument as though the statute of limitations, once triggered by any violation of the FCA, also cuts off from judicial review any timely claims of the same kind or character. However, they cite no authority for this argument. Defendants also clearly misconstrue the FCA statute of limitations in Section 3731. They claim that *all* of Taul's claims are barred by the three-year period found in 3731(b)(2) because Taul related facts to the FBI in 2010 but did not file his initial Complaint until January 2014.

Yet, Section 3731(b)(2) is a tolling provision, not a statute of limitations provision. *See, e.g., United States ex rel. Lewis v. Walker*, No. 3:06-CV-16, 2007 WL 2713018, at *5 (M.D. Ga. Sept. 14, 2007) (Land, J.) (referring to Section 3731(b)(2) as a tolling provision). Defendants "muddy the waters" by treating the statutorily-created tolling provision in Subsection (b)(2) as shortening the general statute of limitations otherwise applicable under Subsection (b)(1). They also ignore the fact that Section 3731 states that a plaintiff's claims are subject to either 3731(b)(1) or 3731(b)(2), *whichever occurs last.*

15

Under the facts of this case, in which Taul became aware of the alleged FCA violations more than six years before the date on which he filed his initial Complaint, any FCA violations committed within six years are timely under Subsection (b)(1). In fact, Taul concedes that the tolling provision in Section 3731(b)(2) does not apply to this litigation. *See* (Doc. 90 at 4) ("In the instant matter . . . the tolling provisions of 3731(b)(2) . . . are [not] applicable"). Accordingly, the court need not reach a decision as to whether, and how, Section 3731(b)(2) applies to relators, a question that has divided federal courts.[8] The six-year statute of limitations period in Section 3731(b)(1) applies to Taul's FCA claims.

The alleged FCA violations began in June 2003 and ended in June 2011. Taul claims that he first became aware of the violations in June 2009. He informed the FBI of the violations in August 2010, and he filed his initial Complaint on January 13, 2014. Under Section 3731(b)(1), Taul's allegations of violations that occurred <u>after</u> January 13, 2008, fall within the six-year limitations period and are timely. Counts I, II, and III all allege some timely and some untimely violations.[9]

---

[8] *See, e.g., United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1218 (9th Cir. 1996); *United States ex rel. Malloy v. Telephonics Corp.*, 68 F. App'x 270, 273 (3d Cir. 2003).

[9] *See, e.g.* (Doc. 47 at 4-5, ¶¶ 18, 19, 20) (alleging violations that occurred both before and after January 13, 2008).

All FCA claims in Counts I, II, and III based on allegations taking place before January 13, 2008, are barred by the statute of limitations. All claims in Counts I, II, and III based on allegations taking place after January 13, 2008, are timely.

### D.   *Statute of Limitations for Count V Claims*

Count V of Taul's Amended Complaint asserts an FCA violation, pursuant to Sections 3729(a)(1)(A-B), "vis-à-vis violation of the Anti-Kickback Statute." (Doc. 47 at 15-18). Defendants' Motion To Dismiss summarily states that all of Taul's claims are time barred, but their Motion does not specifically address what Defendants believe is the applicable statute of limitations for Count V. In fact, neither Defendants' Motion To Dismiss (doc. 85) nor their reply brief (doc. 92) even <u>reference</u> the violations of the Anti-Kickback ("AKS") statute that Taul alleges have occurred.

Taul's Response (doc. 90) to Defendants' Motion To Dismiss similarly fails to clarify for the court what the applicable statute of limitations should be for the claims in Count V. In his Response, Taul states that Defendants failed "to consider the fact that Relator's FCA claims arising from the Anti-Kickback ("AKS") statute were clearly filed within the applicable limitations period," (doc. 90 at 4), but Taul fails to cite to any authority to support this proposition, much less explain why his claim should be "clear" to the court.

17

The Anti-Kickback Statute, in relevant part, prohibits individuals from the following acts involving federal health care programs:

> (2)   Whoever knowingly or wilfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person -
>
> > (A)   to refer an individual to a person for the furnishing or arranging for the furnishing of any time or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B)   to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2). As the Eleventh Circuit has explained, a violation of the AKS occurs when the defendant "(1) knowingly and wilfully, (2) pays money, directly or indirectly, to doctors, (3) to induce the doctors to refer individuals to the defendants for the furnishing of medical services, (4) paid for by Medicare." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 698 (11th Cir. 2014) (citing *United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013) (setting forth the elements of an Anti-Kickback Statute violation under § 1320a–7b(b)(2)(A))).

In addition to the criminal penalties provided for in the statute above, violations of the AKS can lead to civil monetary penalties under the Civil Monetary Penalties Law ("CMPL") for submitting false claims for Medicare reimbursement. *See* 42 U.S.C. § 1320a-7a.[10]

In addition to these criminal and civil monetary penalties, violations of the AKS may serve as the basis for a false or fraudulent claim for purposes of the FCA. *See* 42 U.S.C. §1320a-7(b)(g) ("In addition to the penalties provided for in this section [1320a-7b] or section 1320a-7a of this title [the civil monetary penalties section], a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of

_____

[10] As the Tenth Circuit has explained,

On August 13, 1981, Congress enacted the CMPL, a statute providing for civil monetary penalties and assessments for individuals who file false Medicare or Medicaid claims. 42 U.S.C. § 1320a–7a(a)(1)(A). Such were "in addition to any other penalties that may be prescribed by law . . . ." 42 U.S.C. § 1320a–7a(a). The CMPL also provided that upon conviction a false claimant would be excluded from continued participation in the Medicare and Medicaid programs. 42 U.S.C. § 1320a–7a(a).

The CMPL, as enacted in 1981, was intended to promote an administrative adjunct to criminal proceedings as an additional means of sanctioning persons who submit false claims for payment under the Medicare and Medicaid programs.

*Bernstein v. Sullivan*, 914 F.2d 1395, 1397 (10th Cir. 1990). An action under the CMPL may not be initiated "with respect to any claim, request for payment, or other occurrence" later than "six years after the date the claim was presented, the request for payment was made, or the occurrence took place." 41 U.S.C. § 1320a-7a(c)(1); *see also Bernstein*, 914 F.2d at 1398.

subchapter III of chapter 37 of Title 31 [the FCA].");[11] *see also Miller v. Abbot*

*Laboratories*, 648 F. App'x 555, 561 (6th Cir. 2016) (internal citations omitted)

("AKS violations can constitute FCA violations where a claim submitted to the

government for reimbursement includes items or services resulting from a

violation of the AKS, or where cost reports submitted to the government for

reimbursement include an express certification that the underlying claims comply

with the AKS.").

Count V of the Amended Complaint, which alleges that an AKS violation

occurred, clearly asserts an FCA claim. (Doc. 47 at 17, ¶ 63) ("By reason of the

violation of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), Defendants have

knowingly or recklessly damaged the United States Government in an amount to

be determined at trial).[12] Further, Taul's prayer for relief in Count V requests

treble damages and a civil penalty of $5,500-$11,000, which derives from Section

3729(a)(1) of the FCA as adjusted for inflation. 31 U.S.C. § 3729(a); *see also*

---

[11] *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 311 n. 19 (3d Cir. 2011) ("As part of the comprehensive health care legislation Congress enacted in 2010, it amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111–148 § 6402(f), 124 Stat. 119, 759 (to be codified at 42 U.S.C. § 1320a–7b(g)).").

[12] Taul's heading under Count V also clarifies that he is asserting AKS violations as the basis of an FCA claim. *See* (Doc. 47 at 15) (alleging a "[v]iolation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) vis-à-vis a violation of the Anti-Kickback Statute.").

*Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 379 n. 12

(S.D.N.Y. 2015) ("The 1986 amendments [to the FCA] included a penalty range of

$5,000 to $10,000 for each false claim . . . to be adjusted by the Federal Civil

Penalties Inflation Adjustment Act of 1990, S. Rep. 111-10, 22, 2009

U.S.C.C.A.N 430, 444. Today, due to inflation, the available penalty is a range of

$5,500 to $11,000."). Based on the language of Count V and the damages

requested, the alleged kickback scheme serves as the basis for a false claim under

Section 3729(a)(1) of the FCA.

    The court has not found any authority, and Defendants point to no source,

stating that any statute of limitations other than the FCA statute of limitations

found in Section 3731(b)(1) should apply to Count V merely because the Count is

based on a violation of another statute. Therefore, like Counts I, II, and III, the

statute of limitations for Taul's claims in Count V is 6 years, per Section

3731(b)(1). All claims in Count V based on allegations taking place on or before

January 13, 2008 are time barred. All claims in Count V based on allegations

taking place after January 13, 2008 are timely.

E.    ***"Retention of Overpayments" and the "Reverse False Claims"
       Provision***

Taul's Response brief alleges - for the first time in this litigation - that he

21

has pled facts to support a "retention of overpayments" claim. He asserts that the "Statute of Limitations is Effectively Extended for Retention of Overpayments that violate Section 3729(a)(1)(A), (B), (C), or (G)." (Doc. 90 at 10). Defendants' Reply fails to directly address Taul's "retention of overpayment" argument head-on, asserting instead that Taul has failed to plead any "reverse false claim" violations under Section 3729(a)(1)(G). (Doc. 92 at 2). Because both parties argue past each other and fail to cite to any authority to support their claims, the court will first begin with a discussion of both the "retention of overpayments" statute and the "reverse false claims" FCA provision.

 i.    *Statutory Overview and Recent Changes*

 In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA"), which amended the "reverse false claims" provision of the FCA. *See* Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-25 (2009). Under the pre-amendment version, a reverse false claim violation occurred when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (1986).

 After the 2009 FERA amendment, a reverse false claims violation occurs when a person "knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). An obligation under the FCA is now defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or *from the retention of any overpayment*." 31 U.S.C. § 3729(b)(3) (emphasis added).

The Patient Protection and Affordable Care Act ("PPACA") then defined an "overpayment" as "any funds that a person receives or retains under subchapter XVIII [Medicare] or XIX [Medicaid] of this chapter to which the person, after applicable reconciliation, is not entitled under such subchapter." Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111–148 § 6402, *codified as* 42 U.S.C. § 1320a-7k(d)(4)(B). All overpayments must now be reported and refunded to the government within "60 days after the date on which the overpayment was identified" or "the date any corresponding cost report is due." 42 U.S.C. § 1320a-7k(d)(2)(A-B). Significantly, the PPACA also provided that a "repayment retained by a person after the deadline for reporting and returning the overpayment" is an "obligation" for purposes of Section 3729 of the FCA. 42 U.S.C. § 1320a-

7k(d)(3). Therefore, the retention of a Medicare or Medicaid overpayment from the government past the 60-day deadline creates an obligation for purposes of Section 3729 of the FCA.

        ii.     *Whether a Retention of Overpayment "Obligation" May Be Brought Pursuant to any FCA Provision Other Than Section 3729(a)(1)(G)*

Taul's Response and Surreply briefs assert that Defendants' alleged retention of overpayments violates *not only* Section 3279(a)(1)(G) of the FCA *but also* Sections 3729(a)(1)(A-C). *See* (Doc. 90 at 10); (Doc. 95 at 2).  Defendants' Reply brief altogether fails to address whether retention of overpayment allegations may be brought pursuant to any subsection other than Section 3729(a)(1)(G); instead, Defendants hang their hat on their contention that Taul has not properly pled a claim under subsection (a)(1)(G).[13]

It appears to be an open question in this Circuit whether retention of overpayment claims may be brought pursuant to subsections (a)(1)(A-C) of Section 3729. The PPACA amendments state only that an overpayment retention is an "obligation" for the purposes of "section 3729." 42 U.S.C. § 1320a-7k(d)(3). However, the court finds it unlikely, based on the language added by the PPACA

_____

[13]   While Defendants do not say so expressly, the court assumes that Defendants intend to argue that Plaintiff's newly-raised retention of overpayments claim has not been pled with any particularity pursuant to Section 3729(a)(1)(G) *or any other subsection*.

describing an overpayment retention as an "obligation," that a retention of an

overpayment claim may be brought pursuant to any subsection of Section 3279

that does not use the word "obligation." While Section 3729(a)(1)(G) incorporates

the word "obligation," Sections 3729(a)(1)(A-C) do not.[14]

Additionally, the court notes that when the Eleventh Circuit has previously

faced retention of overpayment claims, these violations have been presented as

obligations pursuant to the reverse false claim provision of the FCA rather than

any other FCA statutory provision. *See, e.g., United States ex rel. Matheny v.*

*Medco Health Solutions, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012) (stating that a

contractual obligation to remit excess government property is an obligation for

---

[14]  *See* 31. U.S.C. §§ 3729(a)(1)(A),(B),(C), and (G)(emphasis added), imposing liability for any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> . . . .

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation* to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an *obligation* to pay or transmit money or property to the Government . . . .

purposes of Section 3729(a)(7))[15]; *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (finding allegations of contractual obligations to identify and return excess government property were sufficient to state a reverse false claim violation); *see also United States v. Crumb*, No. 15-655, slip op. at *8 (S.D. Ala. Aug. 24, 2016) (Steele, J.) (analyzing a retention of overpayment claim brought pursuant to Section 3729(a)(1) as a claim under Subsection (a)(1)(G)). Yet again, Taul has cited to no authority[16] for his proposition that retention of overpayment claims may be brought pursuant to Sections 3729(a)(1)(A),(B), or (C) rather than pursuant to the reverse false claims provision found in Section 3729(a)(1)(G).

For these reasons, this court declines to consider Taul's newly-raised "retention of overpayment" claims under any FCA statutory provision that does not include the word "obligation." As Sections 3729(a)(1)(A-C) do not include the term "obligation" as an element of the claim, Taul's retention of overpayment

---

[15]  31 U.S.C. § 3729(a)(7) is the pre-FERA amendment version of the reverse false claims provision. Section 3729(a)(7) was re-designated as 31 U.S.C. § 3729(a)(1)(G), effective May 20, 2009.

[16]  On this basis alone, the court is not required to address this underdeveloped argument. *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

allegations may not be brought pursuant to those statutory sections. For the purposes of this litigation, and in accordance with previous Eleventh Circuit cases, the court will consider Taul's retention of overpayment allegations in the context of a reverse false claim pursuant to Section 3729(a)(1)(G). The remaining question for the court is whether Taul has properly pled a claim pursuant to that statutory subsection.

### iii. *Taul Did Not Properly Plead a Retention of Overpayments Violation or Otherwise Establish a Reverse False Claim*

Defendants argue that Taul's Amended Complaint (doc. 47) fails to plead a violation of Section 3729(a)(1)(G) with particularity, as required under Federal Rule of Civil Procedure 9(b). (Doc. 92 at 5-7). Though Defendants do not say so expressly, their argument implies that there is no way for this court to address the timeliness of any alleged overpayment retention for the purposes of the FCA statute of limitations because there are no factual allegations that plausibly support such a claim.

In the Eleventh Circuit, any FCA claim, including a reverse false claim, must meet the heightened pleading requirements under Rule 9(b). *United States ex rel. Clausen v. Laboratory Corp. of Am.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

27

particularity the circumstances constituting fraud or mistake" but "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). As the Eleventh Circuit has explained,

> At the pleading stage, a complaint alleging violations of the FCA must
> satisfy two pleading requirements. First, the complaint must provide "a
> short and plain statement of the claim showing that the pleader is
> entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint cannot merely
> recite the elements of a cause of action but must contain factual
> allegations sufficient to raise the right to relief above the speculative
> level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955,
> 167 L. Ed. 2d 929 (2007). Second, a complaint must comply with Rule
> 9(b)'s heightened pleading standard, which requires a party to "state
> with particularity the circumstances constituting fraud or mistake." FED.
> R. CIV. P. 9(b); *Clausen*, 290 F.3d at 1308–09 (holding Rule 9(b) applies
> to FCA claims). The purpose of Rule 9(b) is to "alert[ ] defendants to the
> precise misconduct with which they are charged and protect[ ]
> defendants against spurious charges . . . ." *Ziemba v. Cascade Int'l, Inc.*,
> 256 F.3d 1194, 1202 (11th Cir. 2001) (citation and internal quotation
> marks omitted).
>
> The particularity requirement of Rule 9(b) is satisfied if the complaint
> alleges "facts as to time, place, and substance of the defendant's alleged
> fraud, specifically the details of the defendants' allegedly fraudulent
> acts, when they occurred, and who engaged in them." *Hopper v. Solvay
> Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation
> marks omitted) (citing *Clausen*, 290 F.3d at 1310); *see also Ziemba*, 256
> F.3d at 1202 (noting the pleading standards are satisfied if alleging
> precisely what statements were made in what documents, when, where
> and by whom, the content, the manner in which they misled the plaintiff,
> and what the defendants obtained as a consequence of the fraud).

*Matheny*, 671 F.3d at 1222.

The applicable pleading standard for reverse false claims depends on

whether the claims are brought under the version of the FCA that pre-dates or

post-dates the 2009 FERA amendment, which became effective May 20, 2009. *See*

*Matheny*, 671 F.3d at 1223 n. 9.

> As another district court within this Circuit has stated,

> For the reverse false claim pleaded as Count III of the Amended Complaint, the applicable legal standard depends on whether the claims are brought under the version of the False Claims Act that predated the Fraud Enforcement & Recovery Act of 2009, § 4(a), Pub. L. No. 111-21, 123 Stat. 1617, 1621-22 (2009) ( "FERA"), or whether they proceed under the version of the Act that prevails post-FERA. Under the pre-FERA iteration of the FCA, a plaintiff generally must allege "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or caused to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government, and (5) the materiality of the misrepresentation." *Matheny*, 671 F.3d at 1224. After FERA, however, reverse false claims liability attaches either (i) when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government;" or (ii) when a person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see also United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 322 (D.N.J. 2015) (observing that § 3729(a)(1)(G) "creates liability for two categories"). "Both of these prongs only apply where there is an obligation to pay the Government." *Petratos*, 141 F. Supp.3d at 322.

*Crumb*, No. 15-655, slip op. at *8 (citing to the post-FERA version of the reverse

false claims statutory subsection).

> Although this case was commenced after the 2009 FERA amendment, the

29

claims alleged "bridge that timeframe and implicate both versions of the law"

because the 2009 FERA amendments to the reverse false claim provision do not

apply retroactively. *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783,

784 n. 1 (11th Cir. 2014); *Matheny*, 617 F.3d at 1223 n. 9. Therefore, the court

must look to both versions to determine whether Taul has properly pled a reverse

false claim.

Fortunately, this court's analysis is simplified by the fact that under both

versions of the statute, the plaintiff relator is required to identify an obligation to

re-pay the government and allege other details of the claim with particularity. *See*

*Matheny*, 671 F.3d at 1223 ("To sustain a reverse false claim action, relators must

show that the defendants owed an obligation to pay money to the United States . . .

") (pre-FERA amendment); *Petratos*, 141 F. Supp.3d at 322 (noting that reverse

false claims liability necessitates a showing of "a 'clear' obligation or liability to

the government") (citations omitted) (pre-FERA amendment); *Crumb*, 15-655, slip

op. at *8 ("To be sure, a reverse false claim cause of action requires an 'obligation

to pay or transmit money or property to the government.'") (post-FERA

amendment). A reverse false claim action, however, does not require that the

presentment of a false claim be pled. *Matheny*, 671 F.3d at 1224 n.12.

In *Matheny*, applying the reverse false claim language predating the FERA

amendment, the Eleventh Circuit concluded that the relators adequately alleged with particularity the existence of an obligation to pay money to the government because their complaint contained detailed allegations of the defendants' express contractual obligation to remit any overpayments; outlined the procedures the defendants should have used to remit any identified overpayments; and identified the particular document or statement alleged to be false, who made it, when the statement was made, how the statement was false, and what the defendants obtained as a result. *Id.* at 1223-1125. The complaint in *Matheny* also contained "detailed allegations that the Overpayments were received from Medicare, Medicaid, or other federally funded healthcare programs" and specified specific amounts, invoice numbers, and carrier codes. *Id.* at 1227.

In *Crumb*, applying the reverse false claim language postdating the FERA amendment, the court found that the complaint identified sufficient facts to show that the defendants had a "concrete obligation to pay the Government at the time of the alleged avoidance." 15-655, slip op. at *16. The complaint specifically pled facts to support a reverse false claim, including that the defendants "did not take any steps to identify and return" overpayments received but instead "knowingly continued with the same course of conduct"; that they "did not conduct a self-audit, investigate, or inquire into whether" any of the relevant claims might

31

necessitate repayment, even after the Government began an FCA investigation into the claims; and that defendants "failed to take any corrective or repayment action." *Id.* at *4, *16.

In the Amended Complaint, Taul only cursorily references the receipt of government funds in paragraphs 22 and 23, which also describe the alleged kickback scheme between the Alabama Organ Center and Defendants. Paragraph 22 alleges that the transportation, embalming, cremation, and harvesting charges to the Alabama Organ Center were above national averages and were inflated when they were submitted to the University of Alabama Birmingham. (Doc. 47 at 5, ¶ 22). Then, once the bills were paid, employees of the Alabama Organ Center received twenty percent as a kickback. *Id.* Paragraph 23 alleges that under the kickback scheme, Defendants billed "$50,000.00 to $60,000.00 each month to the Alabama Organ Center. This bill was paid for with government grants, Medicare, and other federal and taxpayer dollars as these donor services were free to the donor families." (Doc. 47 at 5, ¶ 23).

Simply put, Taul has not pled facts as to the time, place, or substance of any retained overpayments sufficient to sustain a reverse false claim under Rule 9(b). Despite specifically citing to other FCA statutory provisions, Taul's Amended Complaint makes no mention of reverse false claims, Section 3729(a)(7), or

Section 3729(a)(1)(G). Unlike in *Matheny* or in *Crumb*, the Amended Complaint does not specify which reverse false claims resulted in overpayments; has not alleged the receipt of federal funds with particularity; and, unlike in *Matheny*, makes no detailed allegations that any overpayments received actually originated from a federally funded healthcare program. In fact, he does not identify the federal government as the source of any overpayment or use the term "overpayment" at all.

Taul's briefing also fails to clarify which particular set of facts in the Amended Complaint supports allegations that Defendants retained certain overpayments from the government. The Amended Complaint, as it currently stands, does not provide either Defendants or the court with enough information regarding the substance of his reverse false claim or the retention of an overpayment that serves as the obligation underlying that claim.

For these reasons, Taul has failed to allege with specificity if or when Defendants retained any overpayments to the government that would constitute an obligation under Section 3729(a)(1)(G). Accordingly, the court does not need to reach the question of how the 60-day clock for retention of overpayments would impact the FCA statute of limitations. Taul's reverse false claim cause of action based on alleged retentions of overpayments is **HEREBY DISMISSED** as

inadequately pled pursuant to Federal Rules of Civil Procedure 8(a)(2) and 9(b).

### iv.   Taul's Request To Amend his Complaint

In his Surreply, Taul also requested permission to amend his complaint in order to plead a claim under the reverse false claims provision, Section 3729(a)(1)(G).[17] (Doc. 95 at 9-10). To the extent that Taul's request may be construed as a motion for leave to amend, it was filed *far* outside the court's deadline to amend pleadings[18] and therefore must meet the requirements of Rule 16(b)(4). Under the Federal Rules of Civil Procedure, "a schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4).

It has been noted that,

> [w]here . . . a motion to amend "comes long after the deadlines for filing motions to amend established in the scheduling orders entered in [a] case," a plaintiff must "show good cause under Federal Rule of Civil Procedure 16(b)." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1312 (11th Cir. 2009). Simply put, [the motion to amend] is governed in the first

---

[17]   The court notes that Counts I, II, and III already assert claims under §§ 3729(a)(1)(A-C). If Taul truly believed that a retention of overpayments was an actionable obligation pursuant to Sections 3729(a)(1)(A-C) as well as 3729(a)(1)(G), it would be unnecessary for him to amend his Complaint in order to include his retention of overpayments claim.

[18]   The court's June 9, 2014, Scheduling Order set the deadline to amend pleadings as March 31, 2015 and the discovery deadline as June 30, 2015. (Doc. 25). While the court's June 30, 2015, Order extended the discovery deadline to 30 days after the completion of Nagel's criminal case, the Order also stated explicitly that no other deadlines were extended. (Doc. 57). Therefore, more than **twenty-one months** have passed since Taul's deadline to amend his pleadings expired on March 31, 2015.

34

instance by Rule 16(b)(4)'s "good cause" requirement, not by Rule 15(a)(2)'s "freely give leave" standard. *See Smith v. School Bd. of Orange County*, 487 F.3d 1361, 1367 (11th Cir.2007) ("despite Smith's argument on appeal that the district court should have granted his motion to amend his complaint in accordance with the liberal amendment instructions of Rule 15(a), Smith still had to comply with Rule 16(b)'s good cause requirement because he filed his motion to amend . . . after the court's deadline for such motions"); *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1419 (11th Cir.1998) ("[B]ecause Sosa's motion to amend was filed after the scheduling order's deadline, she must first demonstrate good cause under Rule 16(b) before we will consider whether amendment is proper under Rule 15(a).").

Under well-settled law, the "good cause" standard prescribed by Rule 16(b) "precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." [*Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998)] (citation and internal quotation marks omitted).

"Diligence, not lack of prejudice, is the touchstone of the Rule 16(b)(4) inquiry." *Roberson*, 2013 WL 4870839, at *2 (citations omitted); *see also De Varona v. Discount Auto Parts, LLC,* 285 F.R.D. 671, 672–73 (S. D. Fla. 2012) ("diligence is the key to satisfying the good cause requirement"); *Southern Track & Pump, Inc. v. Terex Corp.*, 722 F. Supp. 2d 509, 521 (D. Del. 2010) ("the good cause standard under Rule 16(b) hinges on diligence of the movant, and not on prejudice to the non-moving party") (citation omitted).

*Jasper Wood Products, LLC v. Jordan Scrap Metal, Inc.*, No. CIV. A. 13-0407-WS-C, 2014 WL 3720530, at *3-4 (S.D. Ala. July 25, 2014) (Steele, J.).

Taul fails to cite to Rule 16 at all in his Surreply and makes no attempt to argue "good cause" for the court to modify its scheduling order and allow him to re-amend his complaint this late in the course of this litigation. Accordingly, the court construes

35

Taul's request to amend his pleadings and add a Count pursuant to 31 U.S.C. § 3729(a)(1)(G) as a Motion for Leave To Amend, which is hereby **DENIED** for his failure to mention, much less show, good cause under Rule 16(b).

### F.    *Defendants' Two Motions for Leave To File a Response To Plaintiff's Surreply*

Defendants' (doc. 97) Motion for Permission To File a Response To Plaintiff's Surreply is a duplicate filing of its (doc. 96) Motion for Leave To File a Response To Plaintiff's Surreply. Both Motions state Defendants' intent to discuss the heightened Rule 9(b) pleading requirements for FCA claims and their belief that the FCA statute of limitations bars all available claims under the FCA. Defendants' Motion (doc. 85) and Reply (doc. 92) already brought both issues to the court's attention, and the court has already addressed both matters in this Opinion. The court will not permit Defendants to rehash arguments they have already made. Therefore, both Motions are due to be **DENIED**.

### G.    *Defendants' Pending Discovery Motions*

On June 30, 2015, this court extended the deadline to complete discovery in this case until thirty days after the completion of Jed Nagel's Alabama criminal trial, including any appeals. (Doc. 57). The last joint status report filed by the parties on February 1, 2016, informed the court that the related criminal trial had been continued

until July 11, 2016. (Doc. 83 at 1). The court has received no further update since February 2016 on the status of this criminal trial.

On October 21, 2016, Defendants filed a Motion To Quash Plaintiff's Second Deposition Notice and Accompanying Request To Produce Documents at Deposition (doc. 86, the "Motion To Quash"); a Motion To Strike/Defendants' Objections To Plaintiff's Second Set of Interrogatories and Requests for Production (doc. 87, the "Motion To Strike"); and a Motion To Amend/Correct the prior (doc. 86) Motion To Quash (doc. 88, the "Motion To Amend"). In each Motion, Defendants object to discovery requests made by Taul because they incorrectly claim, as they did in their Motion To Dismiss, that the statute of limitations has run on every claim asserted in the Amended Complaint. *See* (Doc. 86 at 1, ¶ 2); (Doc. 87 at 2, ¶2); (Doc. 88 at 2, ¶2). Taul has not responded to any of these Motions.

The Motion To Quash and Motion To Amend both ask the court to enter an order quashing the Plaintiff's second notice of deposition, which was set to take place on November 2, 2016. The court has no idea whether the deposition has already taken place or did not go forward due to the pending Motions. Defendants' Motion To Strike objects to Taul's second set of interrogatories and request for production of documents, particularly documents relating to allegations of retaliation. (Doc. 87 at 2). Because Taul has not responded to this Motion, the court cannot tell if he is

37

contesting it. Due to the ambiguous status of the overriding discovery deadline in this case, all three discovery Motions (docs. 86, 87, and 88) are due to be **DENIED WITHOUT PREJUDICE** to refiling them, but only to the extent that they are not now **MOOT** and only to the extent that they do not rehash arguments already rejected by this court. Further, both parties are hereby **ORDERED** to file a joint status report regarding the status of Nagel's Alabama criminal case, including any appeals, by **February 10, 2017**.

## VII.   CONCLUSION

Taul's reverse FCA claims, to the extent that they have been pled at all, are not pled adequately. Accordingly, they are hereby **DISMISSED**.

Although some of Taul's other FCA claims are barred by their respective statutes of limitations, not all are so barred. As a result, this court retains jurisdiction to decide Taul's timely FCA claims. All untimely FCA claims are hereby **DISMISSED**. Specifically, Defendants' Motion To Dismiss (doc. 85) is hereby **DENIED** as to the following timely claims:

Counts I, II, and III: FCA claims brought pursuant to 31 U.S.C. §§ 3729(a)(1)(A-C), occurring after January 13, 2008;

Count IV: FCA retaliation-based claims from fall 2012;

Count V: FCA claims based on violations of the Anti-Kickback Statute, occurring after January 13, 2008.

38

In all other respects, such Motion is **GRANTED**. Further, Defendants' Motion for Leave To File a Response to Plaintiff's Surreply (doc. 96) and Motion for Permission To File Response to Plaintiff's Surreply (doc. 97) are hereby **DENIED**. Additionally, the discovery motions (docs. 86, 87, and 88) are hereby **DENIED**.

Both parties are hereby **ORDERED** to file a joint status report regarding the status of Nagel's Alabama criminal case, including any appeals, by **February 10, 2017**. The joint status report must also address whether the issues raised in the three discovery-related Motions (docs. 86, 87, and 88) have been resolved.

**DONE** and **ORDERED** this the 1st day of February, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge